**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**JAMES PAUL DAHL, #72584**                                       **PETITIONER**

**VS.**                              **CIVIL ACTION NO.: 1:09cv298-HSO-JMR**

**RON KING**                                                    **RESPONDENT**

### REPORT & RECOMMENDATIONS

This matter is before this Court on Petitioner James Paul Dahl's Petition [1-1] for Writ of Habeas Corpus which is accompanied by a Memorandum [2-1] in Support. The Respondent has filed a Response [12-1] to which the Petitioner filed a Rebuttal [15-1]. This Court, having been advised in the premises and having considered the entire record, including the lodged state court record, the Petition [1-1] and Memorandum [2-1] in Support, the Response [12-1], the Petitioner's Rebuttal [15-1] and all relevant law, finds that the Petitioner's Petition [1-1] for Writ of Habeas Corpus should be denied.

### I.

### A.

In May of 2003, James Dahl (Dahl) and Eddie Hogancamp (Hogancamp) worked together at James Dahl's brother Gerry's automobile repair shop in Vancleave, Mississippi. During that time, Hogancamp rented and lived in a houseboat that belonged to Gerry in Moss Point, Mississippi. Outside of work, Dahl and Hogancamp also spent time fishing and doing drugs together at the houseboat. Dahl testified that this drug use was limited to smoking marijuana; Hogancamp claims the two smoked marijuana, crack and methamphetamine.

1

The events that led to Dahl's conviction took place during Memorial Day weekend of 2003. During that weekend, Dahl's youngest daughter was sent to the hospital for asthma-related problems. Dahl spent much of the first part of the weekend at the hospital, staying overnight on Saturday. On Sunday, May 25, 2003, Dahl left the hospital, called Hogancamp, and arrived at the houseboat in the morning to smoke marijuana and fish. The events following Dahl's arrival at the houseboat are in dispute. Hogancamp confessed to killing both Cheryl Sellers by stabbing her, and Harold Neal by shooting him with a .22 caliber rifle. Dahl admits to being present at the houseboat during the murders, and aiding Hogancamp in covering up the murders and disposing of the bodies. However, Dahl denied any participation in planning the robbery or the murders.

At trial, Hogancamp testified that once Dahl arrived at the houseboat, the two men devised a plan to get some crack cocaine. They decided to lure Hogancamp's crack cocaine dealer, Harold Neal, to the houseboat, kill him and then rob him of the drugs. To entice Neal to the houseboat, Hogancamp called him and told him he had the money he owed him. The two men then drove separately to a local convenience store to hide Dahl's vehicle so as to deceive Neal when he arrived at the houseboat. Once Neal arrived, Dahl was to hide in a bedroom and as Neal entered, burst from the room and strike Neal over the head with a baseball bat. Once stunned, the men would kill Neal and rob him of his crack-cocaine.

Hogancamp further testified that the plan faltered when Neal arrived at the houseboat with a friend, Cheryl Sellers. When the two entered the houseboat, Dahl did not immediately attack Neal, rather Hogancamp went upstairs to get some marijuana and a pipe so Hogancamp, Neal and Sellers could smoke more marijuana. At some point after Hogancamp returned to the first floor, Dahl burst through the door and struck Neal in the head. But the blow did not debilitate Neal as expected, it only stunned him. Soon, Dahl and Neal began to struggle over the

bat. Hogancamp testified that he grabbed Sellers, stabbed her multiple times, and after she fell to the ground, grabbed a .22-caliber rifle and shot Neal through the chest as he lied on the floor.

At trial, Dahl denied any participation in planning or killing Neal or Sellers. Dahl claimed he was told to hide in a side bedroom so as not to be seen by Hogancamp's dealers and left the room only upon hearing a gunshot and a woman screaming. Dahl testified that when he entered the room of the attack, Neal was already shot and that he pulled Hogancamp away as he was stabbing Sellers, who was lying on the floor.

After the killings, Dahl did admit to helping Hogancamp in cleaning blood from the houseboat and disposing of the bodies. Once the two men took cash and keys out of Neal's pockets, they ditched Neal's car in nearby Biloxi and returned to the convenience store to buy cleaning supplies and pick up Dahl's vehicle. They returned to the houseboat and cleaned the floors and walls, cutting out a portion of carpet where blood had pooled and moved both bodies to a nearby island. After their efforts to conceal the crime and hide the bodies, Dahl left to return to the hospital to visit his daughter, and Hogancamp left shortly thereafter to stay with his sister.

Over the next week the men went back to work at the automobile repair shop, talking sparingly about the crime but planning to revisit the island to move the bodies to a more discreet location. However, later in the week, Hogancamp packed his tools in his car and departed to hide out on family land in Tennessee and then onto visit sisters in Illinois. After Hogancamp left town, Dahl revealed some of the events to his brother Gerry and the two went to inspect the houseboat. Upon discovering the condition of the houseboat, broken windows, missing carpet, and bloodstains on the on the wall and floor, Dahl and his brother returned to his shop and Gerry immediately called Ricky Jones, a detective with the Jackson County Sheriff's Department, and met him out at the houseboat.

In the meantime, Hogancamp's family in Tennessee and Illinois convinced Hogancamp to turn himself into the sheriff in Weakley County, Tennessee. During this time, Hogancamp gave numerous conflicting reports as to the events on the houseboat to his family and law enforcement in both Tennessee and Moss Point, Mississippi. Eventually, Hogancamp confessed to the crime in Moss Point and Dahl's participation in the plan to kill and rob Neal of crack-cocaine. Dahl turned himself in to Moss Point law enforcement on June 8, 2003 and gave a statement confirming many of the events of that day but denying any participation in devising a plan to kill Harold Neal.

**B.**

Dahl and Hogancamp were indicted by a grand jury on May 7, 2004 on two counts of capital murder. On January 12, 2005, Hogancamp pled guilty in Circuit Court of Jackson County and received concurrent life sentences with opportunity for parole. Dahl entered a plea of not guilty and proceeded to trial in August of 2005.

The prosecution built its case around the testimony of Hogancamp and circumstantial evidence. In a short opening, the prosecution acknowledged that the case would be one of credibility, and that the jury should look to the corroborating evidence and Hogancamp's religious conversion as a sign of his veracity. It pointed to the consistencies in the stories of the two men, and that in their differing accounts of the attack, the circumstantial evidence aligned with Hogancamp. The defense centered its focus on the credibility of Hogancamp, as he was the only eyewitness implicating Dahl.

The prosecution called five witnesses. Prominent among them were Chuck Coleman, the investigating officer with the Moss Point police department, Hogancamp and their expert witness, a forensic pathologist. With the testimony of the detective and the forensic pathologist,

4

the prosecution introduced circumstantial evidence of the crime, including blood stains and knife and gun wound evidence, corroborating Hogancamp's version of events while contradicting Dahl's. The defense called two witnesses, relying heavily upon Dahl's testimony that he had no knowledge of the plan to kill Harold Neal and its rigorous cross-examination of Hogancamp.

After several hours of deliberation, the jury convicted Dahl of two counts of Capitol Murder. He was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections on each count on August 26, 2005. Dahl appealed his convictions to the Mississippi Supreme Court.  On December 11, 2007, the Mississippi Court of Appeals affirmed the Petitioner's convictions and sentences.  *Dahl v. State*, 989 So. 2d 910 (Miss. Ct. App. 2007), *reh'g. denied*, 2008 Miss. App. LEXIS 277 (Miss. Ct. App. 2008), *cert. denied*, 993 So. 2d 832 (en banc).

## C.

On January 8, 2009, the Petitioner filed an "Application For Leave To Proceed In Trial Court with Motion to Vacate Convictions," a "Motion to Vacate The Convictions," and a memorandum in support thereof in the Mississippi Supreme Court arguing that he received ineffective assistance of counsel, prosecutorial misconduct, appellate court error, and cumulative error.  On February 12, 2009, the Mississippi Supreme Court denied the Petitioner's application, finding as follows:

> After due consideration, this panel finds that the issues set forth by Dahl fail to overcome the burden established in *Strickland v. Washington*, 466 U.S. 668 (1984).  Further, the panel finds that Dahl fails to make a substantial showing of a denial of a state or federal right as required by Miss. Code Ann. §99-39-27(5) and that the application should be denied.

*Dahl v. State*, No. 2009-M-00028 (Feb. 12, 2009) (en banc). Thereafter, Petitioner filed a second application for post-conviction collateral relief. The Mississippi Supreme Court found

Petitioner's second petition procedurally barred as a successive writ not fitting within any recognized exception and dismissed the petition on March 26, 2009. (*See* Ex. "B" Attach. Resp. [12-2].)

Dahl filed the instant Petition for a Writ of Habeas Corpus on May 8, 2009, raising the following grounds for relief, as stated in his petition:

1. Defendant was denied effective assistance of counsel guaranteed to him by the Sixth Amendment to the United States Constitution and Article 3, Section 26 of the Mississippi Constitution.
    1.1. Counsel failed to follow-up on admission on the State's final witness, the investigating officer, when he admitted that "all the evidence hasn't been concluded, as far as processing."
    1.2. Counsel failed to procure the attendance and testimony at trial of a crucial witness, Sheriff Mike Wilson of Weakley County, Tennessee.
    1.3. Counsel failed to introduce into evidence the video-taped confessions of co-defendant, Eddie Hogancamp.
    1.4. Counsel's exhaustion rendered him ineffective.
    1.5. Counsel failed to raise a *Batson* Challenge.
    1.6. Counsel failed to object to legally erroneous jury instructions regarding accomplices.
    1.7. Counsel failed to offer a theory of the defense jury instruction.
    1.8. Counsel failed to interview the co-defendant in a timely fashion.
    1.9. Counsel failed to object to testimony of pathologist graphically describing maggot infested bodies.
    1.10. Counsel failed to move for a mistrial or a new trial in light of jury's deliberations during approach of Hurricane Katrina.
2. The verdict is against the overwhelming weight of evidence.
3. The court erred in refusing to grant defendant's motion for a continuance and-or motion to suppress.
4. Petitioner was denied constitutional right to a fair trial and effective assistance of counsel upon prosecutor's concealment, misuse of, and nondisclosure [sic] of favorable evidence.
5. Petitioner was denied constitutional right to a fair trial and effective assistance of counsel upon prosecutor's knowing use of false testimony.

6.  Petitioner was denied constitutional right to a fair trial and effective assistance of counsel upon prosecutor's improper prejudicial misstatement of material fact during closing argument.

7.  Petitioner was denied constitutional right to a fair trial and effective assistance of counsel when prosecutor's vouching for the believability of prosecution witness was prejudicial and counsel did not object thereto.

8.  Petitioner was denied constitutional right to a fair trial and effective assistance of counsel upon prosecutor making material fact, misstatement of law.

9.  Petitioner was denied constitutional right to effective assistance of counsel where counsel failed to object to legal defect in the proceeding resulting in denial of due process.

10. Petitioner was denied constitutional right to due process, and equal protection, of the law by Mississippi Court of Appeals during his direct appeal.

11. Petitioner was denied constitutional right to a effective assistance of counsel where counsel's failure deprived petitioner of substantial and procedural rights to which the law entitled him.

12. Petitioner was denied constitutional right to a fair trial and effective assistance of counsel where without objection the prosecutor was allowed to introduce, and misuse, incompetent evidence that was inherently prejudicial

13. Cumulative effect of errors require convictions to be vacated

(*See* Pet'n. [1-1]). Presently, Dahl is lawfully in custody of Ron King, Superintendent of the South Mississippi Correctional Institute in Leakesville, Mississippi.

## II.

The authority of this Court to issue habeas corpus relief for persons in custody of the state is granted by 28 U.S.C. § 2254 as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). As Dahl filed his Petition [1-1] on May 8, 2009, this Court will apply § 2254 as amended. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997) (Recognizing AEDPA amendments apply to all cases filed after its effective date of April 26, 1996.) The text of § 2254 states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any cliam that was adjudicated on the merits in State Court proceedings unless that adjudication of the claim-

(1) resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254.

As a threshold matter, this Court must first determine whether the state court adjudicated Dahl's claims on the merits, and therefore must apply the standards of 2254(d)(1-2), or on procedural or exhaustion grounds demanding a different statutory analysis. Neither party denies that all claims within Dahl's federal Petition [1-1] were brought before State Court either on direct appeal or through post-conviction relief.

Federal courts presume that a state court adjudicated a claim on the merits when it has been presented with a federal claim and has denied relief absent an indication of reliance upon state procedural law. *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011). By the terms of § 2254, a state court need not give an opinion or statement for the reasons of its denial, nor must a state court "cite or even be aware of cases under 2254(d)." *Id.* at 784. A claim will be analyzed under the terms of § 2254(d) "whether or not the state court reveals which of the elements in a multi-part claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." *Id.* It is now established that a state court summary ruling is an "on the merits" adjudication for § 2254 purposes. *Id.* at 785.

The presumption of a merit-based decision can be overcome "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* Respondent urges and this Court agrees that all of Dahl's claims were adjudicated on the merits either on direct appeal or post-conviction relief except "Ground 2," which was found to be procedurally barred on direct appeal. (Resp. [12-1] 11); *Dahl v. State*, 989 So. 2d 910, 915 (Ms. Ct. App. 2007) ("[Dahl] is

8

procedurally barred from arguing it before this Court.") Dahl contends in Ground Ten that the Mississippi Court of Appeals failed to reach his *Batson* claim in its decision on direct appeal. However, following the rationale of *Harrington*, it was the "claim" that the Mississippi Court of Appeals decided, not the components, and no explanation may be necessary.[1] *Harrington*, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."). Therefore, all claims within Dahl's petition will be considered adjudicated on the merits with the sole exception of Ground Two. This Court will first address Ground Two.

### III.
### A.

Federal judicial authority to grant the Great Writ is restrained by an over-arching commitment to state courts as the "principal forum for asserting constitutional challenges to state convictions." *Richter*, 131 S. Ct. at 787. "'Federal intrusions into state criminal trials frustrate both the State's sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.'" *Barber v. Johnson*, 145 F.3d 234, 238 (5th Cir. 1998) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993)). With the guiding considerations of comity and federalism in mind, Congress has codified deferential standards for review of state merit-based decisions in 2254(d), and the courts have adopted the complimentary doctrines of exhaustion and the procedural bar. The exhaustion requirement and state procedural bars act to ensure that petitioners first present their federal claims in state court, giving the State its rightful and proper

---

[1] In Ground 10, Dahl argues that the Mississippi Court Appeals erred in not deciding his *Batson* claim. Though an examination of that claim will rest on similar legal principles as the "on the merits" analysis a federal court must first pursue in evaluating a claim arising under § 2254, this court will address both separately.

"'opportunity to address those claims in the first instance.'" *Cone v. Bell*, 129 S. Ct. 1769, 1780 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

"When a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Id*. A state court's rejection is "independent" when its holding is grounded in a basis independent from the merits of the federal claim. To be recognized as an "adequate" procedural bar, the procedural rule must be "strictly or regularly applied evenhandedly to the vast majority of similar claims." *Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998) (internal citations omitted). The adequacy of a state procedural bar is a determination reserved to the federal courts. *Cone*, 129 S. Ct. at 1780; *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

If the state procedural bar is decided to be independent and adequate, the federal court must refuse the claim unless the petitioner can show either "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the refusal of the federal to court to hear the claim would result in "a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In *Murray v. Carter*, the United States Supreme Court faced the question of cause and prejudice due to attorney error. In its opinion, the Court held that cause for procedural default turns on whether the petitioner can show counsel's efforts to comply with the procedural rule were impeded by an objective external factor. 477 U.S. 478, 488 (1986). If counsel represented petitioner in a manner satisfying the constitutional standard set forth in *Strickland v. Washington*, there is "no inequity in requiring [the petitioner] to bear the risk of attorney error that results in procedural default." *Id*.

In *Schlup v. Delo*, the Supreme Court sharpened the point on the fundamental miscarriage of justice exception. To properly invoke this exception and avoid a state procedural bar, a petitioner must make a showing that he is actually innocent as a factual matter. When a habeas court is confronted with a claim of innocence that is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits," the "evidence of innocence need carry less of a burden." *Schlup*, 513 U.S. at 315-16. For this gateway claim to be viable there must be new, reliable evidence that demonstrates it is more likely than not that no reasonable juror would have convicted the petitioner.[2] *Id.* at 327; *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999). An initial *Schlup* "gateway showing" preserves the importance of "finality, comity, and conservation of scarce judicial resources," *Schlup*, 513 U.S. at 324, and reserves the right to discard the bar only in "extraordinary" cases. *House v. Bell*, 547 U.S. 518, 537-38 (2006).

## B.

In Ground Two, Dahl contends that the verdict was against the overwhelming weight of evidence. (Mem. In Supp. [2-1] 22). On direct appeal, the Mississippi Court of Appeals found this claim to be procedurally barred. *Dahl v. State*, 989 So. 2d 910, 915 (Miss. Ct. App. 2007), *reh'g denied*, 2008 Miss. App. LEXIS 277 (Miss. Ct. App. 2008), *cert. denied*, 993 So.2d 832 (Feb. 12, 2009) (en banc). Pursuant to the state procedural rule, a challenge based on the weight of the evidence must be first raised in the defendant's motion for new trial. *Id.* (citing *Beckum v. State*, 917 So. 2d 808, 813 (Miss. Ct. App. 2005)). Because the Court of Appeals expressly relied

---

[2] Though a petitioner must put forth new, reliable evidence, a habeas court must examine all evidence, "old and new, incriminating and exculpatory," *House v. Bell*, 547 U.S. 518, 538 (2006),  while maintaining the "understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence." *Schulp*, 513 U.S. at 328.

on this rule as a procedural bar to Dahl's evidentiary claim, this Court presumes its adequacy and independence. *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir. 1995) (citing *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Bishop v. Epps*, 2007 WL 2363465 *5 (N.D. Miss. 2007).  Dahl may rebut this presumption with a showing that the state did not strictly or regularly apply this particular procedural bar at the time of his appeal or has failed to apply the bar to weight of evidence claims identical or similar to that made by Dahl. *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997).

Dahl argues that because the Mississippi Supreme Court has recognized a broad exception to procedural bars "in the interest of justice," the procedural bar is inconsistently applied. (Mem. In Supp. [2-1] 22; Resp. in Opp. [15-1] 10). Looking past Dahl's failure to cite case law properly supporting his claim, Dahl fails to rebut the presumption of adequacy and independence. Taken liberally, Dahl argues that the justice-based exception allows Mississippi courts to overlook failures to preserve points of error at trial when they are a result of ineffective assistance of counsel.[3] However, the mere existence of an established exception to a state rule does not mean that the law is inconsistently applied. *Emery v. Johnson*, 139 F.3d 191, 195-196 (5th Cir. 1997). Dahl has made no other showing supported by evidence that Mississippi has applied the law inconsistently to the majority of claims similar to his.

Next, taking Dahl's petition and response liberally, Dahl makes a claim that the procedural bar should be set aside for cause and prejudice. However, Dahl does not cite any objective external force obstructed counsel from presenting a sufficiency of evidence claim in his Dahl's motion for a new trial. Rather, he places blame on ineffective assistance counsel.

---

[3] The Court, taking Dahl's pleading liberally, will also consider this argument and its accompanying support  in Dahl's claim to set aside the procedural default due to cause and prejudice.

For a successful showing of ineffective assistance of counsel, Dahl must meet the two prongs of a *Strickland* analysis: first, that counsel's performance was deficient and second, that this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A showing of prejudice requires that "[t]he likelihood of a different result must be substantial," *Harrington*, 131 S. Ct. at 792, and that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. Dahl must satisfy both of these prongs, deficiency and prejudice, by a preponderance of the evidence. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999), *cert. denied*, 528 U.S. 947 (1999).

Though failure of counsel to raise this claim in its motion for a new trial may be a deficiency, this Court finds that Dahl is unable to meet *Strickland*'s second prong by showing this failure resulted in prejudice. Dahl argues the error was significant and prejudicial because "not one person has ever even assumed, asserted or accused petitioner of killing anyone." (Rep. in Opp. [15-1] 10.) Yet Dahl was indicted and later convicted under MISS. CODE ANN. § 97-3-19(2)(e), for the killing of another without authority of law done with or without design while engaging in the commission of robbery as defined by MISS. CODE ANN § 97-3-73. At trial, sufficient evidence was put forth of both killings and of the underlying robbery to allow a reasonable jury to convict Dahl of both crimes. Furthermore, Dahl puts forth no other evidence that counsel's errors deprived him of a fair trial or that there is a substantial likelihood that the trial would have differed absent counsel's error.

Lastly, Dahl makes a claim of actual innocence to excuse the procedural default. As an initial matter, this Court finds that Dahl presents no new, reliable evidence supporting his innocence and his claim is not credible under a *Schlup* analysis. However, assuming that sufficient evidence is before the Court to entertain Dahl's innocence claim, it still must fail.

The large part of Dahl's actual innocence claim is statutorily based; he asserts that all elements of the crime have not been met and his conviction is improper. In addition, he suggests the testimony of Hogancamp is not sufficient to support a conviction and that the prosecution allowed such testimony knowing of its falsity.

Again, Dahl was convicted under Mississippi's felony murder statute for deaths that occurred while engaged in the commission, or the attempted commission, of a robbery. The statute simply forbids the killing of another human being when engaged in robbery "regardless of intent." *Grant v. State*, 8 So. 3d 213, 216 (Miss. Ct. App. 2008). The intent to commit a robbery can be shown from circumstantial evidence. *Goff v. State*, 14 So. 3d 625, 650 (Miss. 2009). There was evidence before the jury of a plan and intent to rob Harold Neal, that the two did in fact rob Harold Neal after his death, and that Harold Neal and Cheryl Sellers were killed during the commission or attempted commission of the underlying crime. No evidence need be produced that Dahl murdered either of the victims himself or that he had any intent that they be murdered, only that the murders occurred during the commission of the robbery. Despite Dahl's arguments to the contrary, it is in the jury's province to make reasonable determinations based upon the evidence presented.

This is not an "exceptional" case as contemplated by the *Schlup* Court, and as Dahl has not made a sufficient showing of factual innocence. Pursuant to the foregoing analysis, Dahl's claim in Ground Two is procedurally barred on adequate and independent state grounds.

### III.

### A.

The purpose of the AEDPA amendments to 28 U.S.C. § 2254 was to minimize the role of federal habeas courts to "prevent federal habeas 'retrials' and to ensure that state-court

14

convictions are given effect to the extent possible under law." *Bell*, 535 U.S. at 693 (quoting *Williams v. Taylor*, 529 U.S. 362, 386 (2000)). In a habeas courts' deferential posture, habeas relief may only be granted under the "contrary to" clause of § 2254(d)(1) with a showing that the state court's decision was contrary to then clearly established federal law. Under the "unreasonable application" clause of § 2254(d)(1), only a showing that the state court unreasonably applied the correct federal legal principle to the facts of the case will support relief. *Bell*, 535 U.S. at 693. Third, relief may be granted if the state court decision "was based on an unreasonable determination of facts in light of the record before the state court." *Harrington*, 131 S. Ct. at 785. This is a difficult burden to overcome, as § 2254 is understood to "guard against extreme malfunctions in the state criminal justice system." *Id.* at 786. The Great Writ is to be issued only when "there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Id.*

The focus of any inquiry under the "unreasonable application" clause of § 2254(d)(1) is determining if the state's application of clearly established federal law was objectively unreasonable. *Bell*, 535 U.S. at 693. The Court has repeatedly asserted that an unreasonable application is wholly distinct from an incorrect one. "[A] federal habeas court my not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, the application must also be unreasonable." *Williams*, 529 U.S. at 408. In a § 2254(d)(1) analysis, federal courts are now limited "to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011); *Rabe v. Thaler*, - F.3d -, 2011 WL 3311756 *3 (Aug. 3, 2011) (recognizing the limitation of a federal habeas court to the state

record as held in *Pinholster*.) As a result, "a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 1400.

When a petitioner raises a § 2254(d)(2) claim, the habeas court considers if the state court decision was grounded in an "unreasonable determination of facts in light of the record before the state court." § 2254(d)(2). In its analysis, a federal habeas court presumes that the underlying state court made sound factual findings. *Woods v. Quarterman*, 493 F.3d 580, 584 (5th Cir. 2007).  However, that presumption may be rebutted by the petitioner with clear and convincing evidence. *Id.*

**B.**

Dahl's claims in Ground One, A-J, Ground Nine and Ground Eleven are all based upon ineffective assistance of counsel. Grounds One, Nine, and Eleven were brought forth either on direct appeal or post-conviction relief and were each denied as not meeting the burden of *Strickland v. Washington*.

The *Strickland* standard is a highly deferential one, and likewise is the standard of § 2254. When coupled together, the review is "doubly deferential." *Cullen*, 131 S. Ct. at 1403. It is imperative that the two standards be kept apart; the question under a *Strickland* review via § 2254 is not one of the reasonableness of counsel's actions, but rather "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. The *Strickland* standard "must be applied with scrupulous care," as an ineffective assistance claim may serve as a route to avoid defaults of waiver or raise issues not brought forth at trial thereby undermining "the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 131 S. Ct. at 788.

For relief under *Strickland*, a petitioner must satisfy both prongs: first, that counsel's performance was deficient and second, that this deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.  To establish a deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court reviewing a *Strickland* claim "must be highly deferential" and begin with "a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 131 S. Ct. at 787 (quoting *Strickland*, 466 U.S. at 689). Embedded in the Sixth Amendment is a "constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689). Further, a federal habeas court must be mindful that a general rule demands "more leeway [to] courts . . . in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

A showing of prejudice requires that "[t]he likelihood of a different result must be substantial," *Harrington*, 131 S. Ct. at 792, and that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. The analysis does not turn on the possibility of a different result in the proceedings; it is focused on whether the deficiency of counsel "undermines the confidence in the outcome" and that the "trial cannot be relied on as having produced a just result." *Id.* at 694, 686.

Dahl first argues that counsel's failure to follow up on an admission of prosecution witness was deficient and prejudicial.  The investigating officer, Chuck Coleman, admitted on the stand that, "As far as I know, we haven't – all the evidence hasn't been concluded, as far as the processing." (S.C.R., vol. 7, 710). Dahl claims that the failure of counsel to follow up on exactly what "evidence" the detective was referring to was deficient and prejudicial. However, upon a

17

reading of the record, the context of the whole colloquy reveals that counsel's objective in this line of questioning was to prove that there was no scientific data linking Dahl to the scene of the crime, only his voluntary admission. Following up on what evidence may have been "processing," would have provided the witness with an opportunity to present other evidence that may have linked Dahl to the scene, undermining counsel's strategy.

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). The state court was reasonable in finding that Dahl cannot overcome the presumption afforded to counsel's trial strategy. However, if this Court were to assume that counsel's performance in this respect was deficient, Dahl still must show that the deficiency undermined the fairness of the trial and but for that deficiency, there is a substantial likelihood the result would have been different. Dahl points to no specific items of evidence that may have been "processing" that would have changed the outcome of the trial. Dahl was convicted not for killing Neal and Sellers himself, but for participation in a robbery that resulted in the deaths of the two. There is no reason to believe blood evidence, photographs of the scene, or police reports would have presented any new, relevant information to the jury about the plan between Dahl and Hogancamp or the underlying robbery. The jury heard testimony from Dahl and Hogancamp about the crimes, as well as testimony from several sources concerning the crime scene and Hogancamp's multiple false confessions. This court finds that Dahl has failed to establish his claim for ineffective assistance of counsel in Ground One, Part A.

In Part B, Dahl contends that counsel's failure to procure the testimony of Sheriff Mike Wilson of Weakely County, Tennessee constituted ineffective assistance of counsel. Claims of ineffective assistance based on uncalled witnesses are "not favored" by federal habeas courts as

what a witness may or may not have said is largely speculative and "the presentation of testimonial evidence is a matter of trial strategy." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). Counsel indicated several times pre-trial that he intended to file an affidavit for procurement of the out-of-state witness. At a pretrial motions hearing counsel stated, ". . . I'm going to call him and that he would testify about the statements that Mr. Hogancamp gave." (S.C.R., vol. 3, 73.) At trial, however, counsel did not follow through with securing the testimony of Sheriff Wilson, and instead relied on an arduous cross-examination of Hogancamp and videotapes taken by Wilson of the interrogation. Further, rather than relying on the Sheriff to authenticate the videotapes, counsel strategically entered into a stipulation with the prosecution as to the videotape's authenticity. (S.C.R., vol. 7, 579).

Rather than calling the Sheriff, counsel chose a cross-examination of  Hogancamp that forced him to admit to his previous lies to his family and law officials, including Sheriff Wilson. With stipulating to the tape's authenticity, counsel could fall back onto the video to impeach any false testimony given by Hogancamp and immediately impeach him with his own statements. In fact, counsel did attempt to employ the tape for such purposes at the outset of Hogancamp's testimony about his statements in Tennessee, looking to impeach Hogancamp on the date he gave his statements to Sheriff Wilson. (S.C.R., vol. 7, 577)("Judge, it shows – it is impeachable, because it shows the date. And all I want to do is show the date that the taped conversation was had. He's testified it wasn't the 7th.").

Using this approach, counsel then forced Hogancamp to flatly admit to his lies to Sheriff Wilson:

> Q: How many interviews did you have with Sheriff Wilson?
>
> A: You showed me three.

Q: Well, I'm asking you, how many – did you have three?

A: Yes, sir.

Q: And each time, you lied, didn't you?

A: Yes, sir.

Q: And I'm going to ask you some questions of what you said. If you don't remember tell us you don't remember. If you don't believe it, tell me you don't believe it and we'll, we'll find out. Okay?

A: Okay. I don't – I mean, I don't recall everything I said. I know I lied to him.

(S.C.R., vol. 7, 585). From this point, counsel went through each false component of each statement asking Hogancamp if he remembered giving the statement. Rather than having the Sheriff testify that he later found out Hogancamp's statements were false, counsel had the prosecution's key witness admit to giving multiple false statements to police.

In order to prevail on an ineffective assistance claim for failure to call a witness, Dahl must show, among other things, that the "testimony would have been favorable to a particular defense." *Day*, 566 F.3d at 538. It is not unreasonable to conclude that testimony from Sheriff Wilson of Hogancamp's lies would not have aided in his defense. The jury heard first hand from Hogancamp that he lied multiple times to both family and friends. Dahl has put forth no evidence that Sheriff Wilson would offer any other proof of Hogancamp's lies to aid in the jury's assessment of Hogancamp's credibility other than those he admitted to on the stand.

Courts recognize the "wide latitude counsel must have in making tactical decisions" and not limit counsel's actions to any particular technique. *Strickland*, 466 U.S. at 689. With this in mind, this Court finds that the state court's finding that counsel's actions and trial strategy were not deficient is reasonable. Assuming, *arguendo*, that the state court was unreasonable in finding

counsel's actions deficient, Dahl must still prove prejudice: that counsel's actions deprive him of a fair trial. Again, Dahl has offered no evidence of what Wilson's testimony would bear other than attacking Hogancamp's credibility. As Hogancamp repeatedly admitted on the stand to lying, this Court finds that Dahl suffered no prejudice and the state-court's refusal of Ground One, Part B was not unreasonable.

Dahl's claims in Part C are closely tied to those in Part B. Dahl argues that failure to introduce the videotaped confessions of Hogancamp constitutes ineffective assistance of counsel. Again, this Court stresses the "wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 689. Counsel stipulated with prosecution as to the authenticity of the tape, had it marked for identification and, as the record reveals, held the video in reserve as potential impeachment evidence. Counsel then proceeded to walk through the transcript of all the statements given to the Sheriff, having the jury personally observe Hogancamp's admission of lies ending in:

> Q: So, it wasn't much truth in none of that conversation with, those conversations with Sheriff Wilson was there?
>
> A: no sir.

(S.C.R., vol. 7, 584-94). With this tactic, as opposed to simply playing the videotaped confessions, counsel set-up a scenario where he had Hogancamp admit to every detail of every false statement given to the Sheriff, and if Hogancamp denied any such statement, could impeach him with the videotape before the jury. Setting aside admissibility problems, merely playing the tape for the jury would allow the defense to only show Hogancamp's statements to Wilson were false and would deprive counsel of the possibility to impeach his in court testimony as well. Accordingly, the Court finds that counsel's trial strategy was not deficient. Dahl has not

21

presented any evidence to show that the failure to show the videotape undermined the outcome of the trial. As a result, Dahl also fails the second prong of the *Strickland* analysis and the state court's denial of Part C was not an unreasonable application of or contrary to clearly established federal law. Part C is denied.

In Part D, Dahl claims that "counsel's exhaustion rendered him ineffective." (Mem. In Support [2-2] 14). According to Dahl, and corroborated by the record, there were two instances during the trial at which counsel indicated that he was tired, once during voir dire and another on the second day of trial. During voir dire, the Judge, prosecution and counsel approached the bench to discuss picking a jury. (S.C.R., vol. 5, 406). The following colloquy ensued:

> [Prosecution]: Don't pick them tonight?
>
> [Court]: No. We'll be 8:00 o'clock, 9:00 o'clock.
>
> [Prosecution]: no objection from the State.
>
> [Counsel]: What – I'm sorry. I'm tired. Wait until in the morning to pick?
>
> [Court]: No. Pick them tonight. We pick them tonight.
>
> …

*Id.* Though counsel admitted to being tired to the court, he made no objection based upon his physical condition to picking a jury that night when given the opportunity.

It is well settled in the Fifth Circuit that "[c]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel." *U.S. v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007). Dahl argues that counsel was tired during voir dire, "at a critical point wherein he failed to make any *Batson* challenges." (Mem. In Supp. [2-1] 14.) However, Dahl fails to show how counsel's failure to raise any *Batson* challenges was a result of counsel's tiredness rather than as a result of trial strategy or simply a good faith belief that there were no *Batson* challenges

to make. Furthermore, the record of jury selection is replete with participation of defense counsel in the jury selection process. Dahl's conclusory allegations, supported by no evidence within the record or in his petition, do not support a finding of deficient representation.

Assuming, *arguendo*, a finding of no deficiency is unreasonable, Dahl was not prejudiced by any such deficiency. Dahl has made no showing that, due to the tiredness of defense counsel, his "trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 694, 686. Dahl does not sufficiently connect counsel's "exhaustion" with his failure to raise or preserve a *Batson* challenge nor does he show that any *Batson* challenge would have substantially altered the outcome of the case. Accordingly, Part D of Dahl's ineffective assistance of counsel claim is denied.

Claim E centers on the failure of counsel to raise a *Batson* challenge to the prosecutor's alleged  use of peremptory strikes during trial in a racially discriminatory manner in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  As Ground Eleven of Dahl's petition is substantively identical, this Court addresses both in its present analysis.

Dahl has asserted in his petition that his trial counsel was ineffective for failing to raise a *Batson* objection at trial, noting that nine of eleven of the State's peremptory strikes were used against members of the white race, the same race as Dahl. A *Batson* objection must be asserted before the venire is dismissed, and a timely objection is an essential condition to the assertion of the *Batson* claim. *See*, *e.g.*, *Wilkerson v. Collins*, 950 F.2d 1054, 1063 (5th Cir. 1992); *United States v. Romero-Reyna*, 867 F.2d 834, 837 (5th Cir. 1989); *Jones v. Butler*, 864 F.2d 348, 369 (5th Cir. 1988); *United States v. Erwin*, 793 F.2d 656, 667 (5th Cir. 1986).  Upon objection, a party must then articulate race-neutral reasons for a peremptory challenge; absent an objection there is no *Batson* violation. *See Thomas v. Moore*, 866 F.2d 803, 805 (5th Cir. 1989).

23

Trial counsel did not raise any objection concerning any peremptory strikes by the State at trial.  After both defense counsel and prosecution informed the court that they had picked a jury, the court asked if there were any matters that needed to be addressed and both responded in the negative. (S.C.R., Vol. 6, 432.)

An attorney's actions during voir dire are considered to be a matter of trial strategy. *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).  A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" *Id.* (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)).  Furthermore, courts analyzing counsel's performance assume a "strong presumption" that the assistance was adequate and "that the challenged conduct was the product of reasoned trial strategy." *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996) (citation omitted). Counsel filed a "Motion To Preclude The Prosecution From Using Its Preemptory Challenges To Exclude People On The Basis Of Race, Gender Or Religion" and argued that motion before the state court at a pre-trial motion hearing held July 22, 2005. (S.C.R., vol. 1, 70-73; S.C.R., vol. 3, 62-65). In his motion and in argument, counsel displayed a reasonable knowledge of the *Batson* decision and its accompanying procedures. The following colloquy supports such a conclusion:

> [Court]: Because the State, or either party, any litigant is only required to give such race-neutral reasons if and when a Batson objection is interposed and if and when the Court decides . . . that there is a pattern of racial or religious or gender discrimination in the exercise of such strikes
>
> The State will not be, nor will the defendant be required to give such reasons on the use of preemptory challenges every time they use one, regardless of objection or other finding by the Court. So, to that extent, . . . that the State be required to give such a reason, irregardless of the other circumstances . . . of a motion . . . of being required to under Batson is denied. . . .[sic]

24

[Counsel]: That is my request, your honor. That's why I wanted a ruling, and I appreciate the Court's ruling.

(S.C.R., vol. 3, 64-65). Counsel was aware of the procedures and requirements of *Batson* during voir dire. Accordingly, the Court entertains a strong presumption that the lack of any such challenges during jury selection was the result of considered trial strategy.

To accept Dahl's argument that counsel rendered ineffective assistance in failing to raise *Batson* challenges, the Court would have to presuppose that discrimination occurred. The burden of proving purposeful discrimination rests with the person alleging the discrimination. *See Batson*, 476 U.S. at 93. Dahl must make out a prima facie case of racial discrimination to shift the burden to the State to provide adequate, race-neutral justifications for the strikes. *Johnson v. California*, 545 U.S. 162, 170 (2005). To establish a prima facie case of discrimination, defendant must produce sufficient evidence to allow "the trial judge to draw an inference that discrimination has occurred." *Id.* The only accurate information contained in the record regarding the racial composition of the venire is that the jury was ultimately composed of five white members and seven black members. (*See* Exs. "YY," "ZZ," "A3," "B3," "C3," "D3," "E3," "F3," "G3," "H3," "I3," "J3" Attach. Pet'r Resp. [15-2] and S.C.R., Vol. 6, 431-33.).

In support of his claim, Dahl attached to his habeas petition juror cards which he claims belonged to the prosecution and were obtained from his previous counsel. (*See* Ex. "B" Attach. Pet'r Mem. [2-1].) Dahl claims that a "B/F" or a "B/M" was marked next to a card during voir dire to identify a juror of the black race. (*See* Pet'r Mem. [2-1] 49.) Dahl submits that a review of these cards reveal that only nine (9) people of the eighty (80) member venire were members of the black race. (Pet'r Resp. [15-1] Answer 16.) However, this figure is incorrect. In his response, Dahl submitted the twelve questionnaires that were prepared by the twelve jurors that were

25

eventually seated for the trial. *See* Exs. "YY," "ZZ," "A3," "B3," "C3," "D3," "E3," "F3," "G3,"
"H3," "I3," "J3" Attach. Pet'r Resp. [15-2]).   Seated jurors 38, 41, 52, and 53 noted on their
questionnaire that they were members of the black race; however, there is no indication on the
prosecutor's juror cards that they were members of the black race.[4] Therefore, the juror cards
submitted by Dahl are not racially accurate and cannot be used to determine the makeup of the
entire jury venire. Any calculation presented to the Court based upon these cards will not be
taken as accurate.

Dahl claims the prosecution used eighty-two percent (nine of eleven) of its peremptory
strikes to exclude members of the white race from being seated as members of the jury.
However, this calculation is based upon the faulty  jury cards and is not reliable. Even if this
Court were to find this calculation reliable, any submission of the number of strikes used against
a discernable group is irrelevant absent "data concerning the entire jury pool." *Medellin v.
Dretke*, 371 F.3d 270, 278 (5th Cir. 2004); *cf. United States v. Alvarado*, 923 F.2d 253, 255 (2nd
Cir. 1991) ("Whether [a challenge] rate creates a statistical disparity would require knowing the
minority percentage of the venire . . ."). As there is no reliable evidence as to the composition of
the jury pool before the Court, Dahl's claim is without merit. The twelve person jury seated for
Dahl's criminal trial was a racially balanced jury composed of five members of the white race
and seven members of the black race.[5]

---

[4] When Dahl attempted to determine the makeup of the venire, he no doubt assumed they were members
of the white race, making his figures incorrect.

[5] Dahl entered a "Motion for Leave Of Court To Invoke Discovery Under Rule 6(a) Of The Rules Governing
Section 2254 Cases" that, in part, sought discovery in support of this *Batson* claim. (*See*  Pet'n Motion [16-1]). After
careful consideration, this Court, in its Order [19-1] denied Dahl's request as failing to meet the standards of §
2254(e)(2). Dahl filed an Objection [20-1] with the District Court. The District Court, in its Order Overruling
Petitioner's Objection To Magistrate Order [28-1], denied Dahl's Objection [201-]. Dahl then filed a Motion for
Reconsideration And/Or Request for Certificate of Appeal [32-1]. Dahl's Motion [32-1] was denied by the District
Court in its Order [34-1]. Thereafter, Dahl filed a Petition Requesting Permission To Appeal Pursuant To F.R.A.P.

Dahl has not carried his burden to present sufficient evidence showing a prima facie case of discrimination. Dahl urges this Court that this "abandonment by counsel" necessitates a presumption of prejudice. (Pet'n [2-1], 52.) However, Dahl cites only one case, *U.S. v. Chronic*, that allows for the presumption of prejudice when accused are denied counsel at critical stages of trial or counsel fails to "subject the prosecution's case to adversarial testing." 466 U.S. 648, 659 (1984). However, as the *Chronic* court noted, "[a]part from circumstances of that magnitude . . . there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Id.* at n.26. Dahl gives only conclusory allegations of prejudice, and after a thorough review of the record, this Court finds that, if counsel's action were deficient, they did not undermine the fairness of his trial. Accordingly, the state court denial of Dahl's claim in Part E of Ground One and Ground Eleven was not unreasonable for purposes of § 2254(d).

Dahl next claims in Part F that counsel was ineffective for failing to object to a legally erroneous instruction regarding accomplices. The Court gave the following jury instruction, styled C-1:

> The court instruct the jury that if you find the testimony of James Earl Hogancamp, an alleged accomplice of the Defendant in this case, to be uncorroborated by other evidence, then and in that event you should view such testimony with great care, caution and suspicion, and that it must be reasonable and not improbable or self-contradictory or substantially impeached.
> You may give the testimony of an accomplice such weight and credit as you deem it to be entitled in light of this principle.

Rule 5(a)(3) [38-1] which was dismissed in a per curiam order by the Fifth Circuit [40-1] for lack of jurisdiction over the appeal.

(S.C.R., vol. 2, 121). In light of the Court giving this instruction, counsel withdrew his own accomplice instruction, D-2. (S.C.R., vol. 9, 884). During the deliberation over jury instructions, neither the prosecution nor defense objected to the giving of C-2. (S.C.R., vol. 9, 870).

Under Mississippi precedent, an accomplice instruction is "given only when the testimony of an accomplice is uncorroborated." *Williams v. State*, 32 So. 3d 486, 494 (Miss. 2010) (Carlson, J., specially concurring). To assert that an accomplice's testimony must be viewed with great caution and suspicion regardless of corroboration, as Dahl does, "is an incorrect statement of the law." *Id.* at 495 (Carlson, J., specially concurring).

Dahl was not legally entitled to an instruction that accomplice testimony should be viewed cautiously in whole. Further, though both prosecution and counsel found Hogancamp's testimony was corroborated,[6] counsel was still able to receive an accomplice instruction. This Court fails to see any deficiency in securing a beneficial instruction in a situation that may not have warranted such an instruction. Furthermore, this Court cannot find a deficiency to object to this legally sound jury instruction in favor of an instruction recognized by the Mississippi Supreme Court as invalid. Assuming, *arguendo*, that counsel was deficient, Dahl gives no specific reasons how this failure prejudiced his defense. As a result, the state court denial of Part F was not unreasonable for purposes of § 2254(d) and Dahl's claim is denied.

Dahl claims in Ground G that counsel was ineffective for failing to offer a theory of defense jury instruction. Dahl claims his defense theory was that Hogancamp intended to kill the victims, and that he did not participate in the murders. As put by counsel in opening statements,

---

[6] Prosecution stated in its closing: "But this doesn't say it has to be corroborated in every little detail. His testimony was corroborated by evidence." (S.C.R., vol. 9, 901) Counsel stated: "Now if it's uncorroborated – well, no it was corroborated . . ." (S.C.R., vol. 9, 928)

". . . at the end of the evidence, I think you will find that all my client is guilty of is accessory after the fact." (S.C.R., vol. 6, 453).

The record of the jury instruction conference is replete with evidence that counsel was aware of, and urged, this defense throughout deliberations. Counsel secured a proper accessory after the fact instruction, C-4, and accessory after the fact was included on the verdict form. (S.C.R., vol. 2, 126); (S.C.R., vol. 9, 895). (Counsel: "But Judge [the verdict form] does have to mention accessory after the fact in there. . . ." Court: ". . . add "accessory after the fact to these last two [jury verdict] forms.") The theory of defense, accessory after the fact, was given as an instruction to the jury. As such, there was no deficiency by counsel and the state court denial of Part G was proper and Dahl's claim is denied.

Next, in Part H, Dahl contends that counsel was ineffective by failing to timely interview the co-defendant. As a result, Dahl claims that counsel was "completely unprepared of [sic] the false testimony co-defendant would give." (Pet. [2-1] 17.) At onset, this Court notes once more that "[c]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel." *U.S. v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007).

Dahl points to no specific instances of false testimony at trial that counsel did not anticipate or rebut. Counsel attended Hogancamp's plea hearing at which he testified fully about his knowledge of the crime and, when presented with new, potentially harmful testimony several days before trial, requested and was granted a continuance to interview Hogancamp concerning his statements. (S.C.R., vol. 4, 286-72). Several times throughout trial, counsel attempted to impeach Hogancamp or questioned the veracity of his testimony. Counsel attempted to use the videotaped confessions to impeach Hogancamp on the date of his voluntary statements. (S.C.R.,

vol. 7, 577). Later in cross-examination, counsel arduously questioned Hogancamp about his admission of Dahl's statements at the Issaquena County jail. (S.C.R., vol. 7, 604-05).

The Court finds that Dahl's conclusory statements are insufficient to show any deficiency by counsel in preparation for trial with regards to Hogancamp's testimony. There is no evidence in the record that counsel was ill-prepared for his cross-examination of Hogancamp, including any of Hogancamp's alleged false testimony. "An attorney may not be faulted for a reasonable miscalculation or lack of foresight or failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S. Ct. at 791.

Assuming, but not conceding, that counsel's performance was deficient, such deficiency did not prejudice Dahl. Counsel performed a reasonably thorough cross-examination of Hogencamp, and Dahl has not submitted any evidence as to how a more timely interview of Hogancampwould have the substantial likelihood of changing the result of his trial. As a result, the state court's denial of Part H was proper.

In Part I, Dahl claims ineffective assistance based upon counsel's failure to object to the testimony of the prosecution's forensic expert that described the "maggot infested bodies." (Pet. [2-1], 18.) At trial, the prosecution called Dr. McGarry, the doctor who performed the autopsies of Neal and Sellers, to testify as a forensic expert. Dr. McGarry testified to the causes of death for each of the victims and to evidence relevant to their deaths gained from the autopsies. The doctor testified that his conclusions were limited due to the decomposition of the bodies. (S.C.R. vol. 7, 623). Because of the decomposed state of the bodies, no bruising or soft tissue injuries could be detected. *Id.* Such evidence is clearly relevant. However, following these statements, the prosecution attempted to introduce pictures of the bodies and Dahl's counsel objected. The trial judge noted that only one case in the "annals of Mississippi jurisprudence" was reversed for

30

the admission of such photos. *Id.* at 626. Yet after argument from counsel and the prosecution, the judge excluded the photographs under rule 403 of the Mississippi Rules of Evidence concluding, "[t]he probative value of these photographs is not [sic] outweighed by its prejudicial effect." *Id.* at 629.

The testimony of the doctor as to the condition of the bodies was relevant and based on the doctor's personal knowledge. Not only must this Court give deference to counsel's tactical approach, but it must not find fault in counsel's failure to lodge a frivolous objection. *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007). The Court also notes that counsel succeeded in preventing the photos from reaching the jury. With these considerations in mind, this Court finds counsel's actions were not deficient nor was the state's denial of this ground unreasonable for our purpose.

In Part J, Dahl claims counsel was ineffective because he failed to move for a mistrial or new trial in light of the jury's deliberation taking place during the approach of hurricane Katrina. Dahl claims that "surely once [the jury] became aware of the size of Katrina they were eager to get home and secure their property and evacuate." (Pet. [2-1] 20.) He further urges that the pressure resulting from news broadcasts about Katrina "was bound" to rush the jury to a verdict. The jury deliberated from 11:06 a.m. to 3:38 p.m. on August 26, 2005, three days before Katrina's landfall. (S.C.R., vol. 2, p. 947, 49). The Court once again acknowledges that "[c]onclusory allegations are insufficient to raise cognizable claims of ineffective assistance of counsel." *U.S. v. Demik*, 489 F.3d 644, 646 (5th Cir. 2007). The claim that jurors were "bound" to be influenced by a category one hurricane over the Florida Keys and they "surely" rushed their judgment is the epitome of a conclusory allegation. In addition, Dahl presented no evidence before the Court that the jury was affected in any way by the storm's approach. This Court finds

Dahl's claims insufficient to raise a cognizable claim and finds no merit to Dahl's claim in Part K.

In Part K, Dahl claims that the cumulative effect of counsel's errors denied him effective assistance of counsel. As the Fifth Circuit stated in *U.S. v. Hall*, "[o]ur clear precedent indicates that ineffective assistance of counsel cannot be created from the accumulation of acceptable decisions and actions." 455 F.3d 508, 520 (5th Cir. 2006). As all parts of Dahl's ineffective assistance claims have been reasonably denied by the state court for purposes of § 2254(d), Dahl's final claim of aggregate error is without merit.

Lastly, in Ground Nine, Dahl claims that counsel was ineffective in failing to object to a legal defect in the proceedings, namely that a special oath for capital cases was not given. This Circuit has recognized that failure to make a meritless or frivolous objection cannot support an ineffective assistance of counsel claim. *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007). Pursuant to MISS. CODE ANN. § 13-5-73, "jurors in capital cases shall be sworn to 'well and truly try the issue between the state and prisoner, and a true verdict give according to the evidence and the law." At the judge's discretion, bailiffs may also be specially sworn.

Dahl contends that the record does not reflect the administration of the special oath. However, upon its own review, the Court found that a special oath was administered. At the opening of voir dire, the judge addressed the jury, reminding them they had "taken an oath earlier today that you will decide the case and apply the law the Court gives you and well and truly try the case." (S.C.R., vol. 5, 324) Without any evidence before the Court otherwise, the judge's verbatim quotation of the special statutory oath provides sufficient evidence that the special oath was given to the complete jury pool. Later, after voir dire, "the jury was specially

32

sworn by the clerk" and the judge noted that the bailiffs had been sworn as well.  (S.C.R., vol. 6, 434).

As the record clearly reflects that the venire, the seated jury, and the bailiffs were all administered the special oath, any objection by counsel would have been meritless and frivolous. Accordingly, counsel was not deficient and did not provide ineffective assistance by failing to object. The claim is denied.

## C.

In Ground Three, Dahl claims that the state court erred in denying his motions to continue and his motions to suppression. We turn first to Respondent's contention that Dahl has not exhausted his claim challenging the denial of his motions to suppress. Respondent urges that though Dahl may have styled his claim in terms of both his motions to suppress and continue, he only pursued the issue of his motions to continue before the state court. As a result, Dahl failed to exhaust the portion of this claim dedicated to his motions to suppress. This Court finds otherwise.

Under the exhaustion requirement, state prisoners challenging a state conviction must first attempt to present their claims to the state court. Like the procedural bar, the exhaustion requirement honors the ideas of comity and federalism that informs federal habeas corpus law. To exhaust their state court claims, prisoners must present the substance of their federal claims "to the highest state court, either through direct appeal or by state collateral review procedures." *Hatten v. Quarterman*, 570 F.3d 595, 605 (5th Cir. 2009). On direct appeal, Dahl presented both issues within this claim before the Mississippi Supreme Court in his "Brief for Appellant" filed April 13, 2007. The Mississippi Court of Appeals affirmed the convictions by opinion dated December 11, 2007. *Dahl*, 989 So. 2d at 916. Dahl then sought a writ of certiorari from the

Mississippi Supreme Court. In part "VI" of Dahl's brief before that court, he raised the issue of "Whether the Court erred in refusing to grant defendant's motions for continuance and to suppress evidence." The Mississippi Supreme Court denied Dahl's petition. *Dahl v.* State, 993 So. 2d 832 (Miss. 2008). Once a prisoner has raised his claims through "one complete round of the State's established appellate review process" the claims are considered exhausted. *O'Sullivan v. Boerkel*, 526 U.S. 838, 845 (1999). The Fifth Circuit recognizes that for a Mississippi prisoner, "one complete round" includes review by both the Mississippi Court of Appeals and the Mississippi Supreme Court. *Taylor v. Turner*, 35 Fed. Appx. 386, 386 (5th Cir. 2002) (citing *O'Sullivan*, 526 U.S. at 839-40). By addressing both claims in his direct appeal to both Mississippi courts, Dahl has satisfied the exhaustion requirement for both issues in Ground Three.

Taking the two issues presented in Ground Three in turn, this Court will first look to the denial of Dahl's motions for continuance. Federal habeas review is limited to errors of constitutional magnitude. Accordingly, when a federal habeas court reviews state evidentiary rulings, its analysis "'is limited to determining whether a trial judge's error is so extreme that it constituted denial of fundamental fairness' under the Due Process clause." *Castillo v. Johnson*, 141 F.3d 218, 224 (5th Cir. 1998)(citing *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986)).

Dahl filed two motions to continue on August 19, 2005. (S.C.R., vol.1, 97; S.C.R., vol. 2, 93). The first, titled "Motion To Suppress," sought to keep out the audiotape of Dahl's statement to Moss Point police. (S.C.R., vol. 1, 87-89). In it, counsel argued that the tape contained important and damaging discrepancies from the accompanying transcript. *Id.* Further, because the tape was produced to counsel approximately one month from trial, these discrepancies were

34

discovered too late to allow the tape to be examined by an expert or to prepare for trial. *Id.* The second motion, "Second Motion To Suppress An Alleged, Custodial Statement [sic]," argued that Dahl's statement to police was an involuntary custodial statement given without a proper waiver of *Miranda* rights and should be suppressed from trial. (S.C.R., vol. 2, 93-101). These motions were argued and denied at a pre-trial motions hearing held Monday, August 22, 2005. (S.C.R., vol. 3, 78; S.C.R., vol. 4, 258-65).

After hearing testimony from Dahl and investigating officers, the judge made a detailed finding on the record. He found Dahl was fully advised of his rights "beyond a reasonable doubt," he executed a knowing, intelligent and voluntary waiver of those rights and his statement was given voluntarily. (S.C.R., vol. 4, 261). The judge also found the tape to be admissible. There was conflicting testimony given by Dahl and the officers about the gaps in the tape and the judge considered Dahl's testimony at the motion hearing about the gaps in the audiotape "to be incredible and not worthy of belief." (S.C.R., vol. 4, 265). Even assuming there was a gap in the tape, the judge cited Mississippi Supreme Court precedent that held a recording was not unreliable or involuntary despite gaps in the recording. (S.C.R., vol. 4, 265)(quoting *Taylor v. State*, 789 So. 2d 787, 796 (Miss. 2001)).

Dahl has put forth no evidence, and this Court finds none in the record, that the judge's denial of these two motions rendered the trial "fundamentally unfair." *Johnson v. Puckett*, 176 F.3d 809, 820 (5th Cir. 1999). The decision to deny the motions was based on a wealth of evidence, including testimony from Dahl, his wife, and both officers that took his statement and sound Mississippi case-law. As the trial court noted, Dahl's statement to police was exculpatory; this is not an instance of the questionable admissibility of an alleged involuntary confession. Rather, it was the voluntary admission of his participation in the cover-up of the crime which

served as the basis for his defense. The denial of the motions to suppress did not amount to a violation of Dahl's due process rights.

Next we will examine Dahl's that the trial court erred in refusing to grant his motion for continuance. As with evidentiary rulings, state denial of motions to continue must rise to a constitutional level to warrant review by a federal habeas court. A petitioner must first show an abuse of discretion and second, that the abuse of discretion was "so arbitrarily and fundamentally unfair that it denied [the petitioner] due process. . ." *Cotton v. Lensing*, 32 F.3d 566, 566 (5th Cir. 1994) (quoting *McFadden v. Cabana*, 851 F.2d 784, 788 (5th Cir. 1988)(footnote omitted), *cert. denied*, 489 U.S. 1083 (1989)). In *Schrader v. Whitley*, the Fifth Circuit acknowledged that the test for determining when an arbitrary denial violates due process rights is not "mechanical." 904 F.2d 282, 288 (5th Cir. 1990). A proper analysis considers the totality of the specific case, "particularly in the reasons presented to the trial judge at the time the request is denied" according to factors that include: the defense's diligence in interviewing and procuring the presence of the witnesses, the defense's estimation of the probability of procuring live testimony within a reasonable time, the specificity with which the defense is able to describe the expected testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony. *Id.*; *Johnson*, 176 F.3d at 822. If a petitioner is able to show abuse of discretion under this standard, he must then show that there is a reasonable probability the verdict might have been different had the court granted his continuance. *Id.*

Dahl filed two motions for continuance on August 19, 2005. (S.C.R., vol. 1, 85; S.C.R., vol. 2, 103). Both relate to the taped statement. His first motion simply states "that the tape the State has and the tape provided the Defendant in discovery seem to have discrepancies. . . . [J]ustice would best be served if a continuance was granted to further investigate these

36

differences." The second argues that the untimely disclosure of the audiotape by the state would render counsel ineffective and undercut Dahl's rights to adequately confront an expert witness. In his petition Dahl argues that the denial of these continuances rendered counsel ineffective and "put defense counsel in an exhausted state of mind" and "allowed the state to introduce into evidence a tampered audio recording." (Pet. [2-1], 27.) Lastly, a third motion for continuance was made by counsel on August 24, 2005, the day before jury selection was to begin, based upon an untimely disclosure by prosecution. The prosecution notified counsel on Friday, August 19, 2005, of a statement Dahl made to Hogancamp in an Issaquena County prison during the approach of Hurricane Ivan in the fall of 2004. Counsel requested a continuance to investigate this disclosure, arguing that a failure to investigate the disclosure would deprive Dahl of a fair trial and render his defense ineffective.

The trial court denied the first motion for similar reasons as the denial of Dahl's first motion to suppress. The judge heard conflicting testimony from Dahl and both interviewing officers, and found Dahl's testimony wholly unbelievable and gave credit to the testimony of the officers. (S.C.R., vol. 4, 265) In addition, pursuant to Mississippi case law, gaps in recorded statements do not render a taped statement unreliable. (*Id.*)(quoting *Taylor*, 789 So. 2d at 796). Because the trial judge's well considered determination was based on argument and evidence produced by both sides at the motion hearing and made in accordance to Mississippi case-law, this Court finds that the state court did not abuse its discretion in denying Dahl's first motion for continuance.

Dahl's second motion for continuance was premised on the untimely production of the audiotape. During the motions hearing, the court heard evidence that Dahl's counsel had been aware of the recorded statement for well over a year. Counsel acknowledged that he was aware

of the audiotape, that he had discussed the tape with Dahl and the prosecution and did not make any claim to the court before that date of any failure of the prosecution to disclose the tape. (S.C.R., vol. 4, 264). Additionally, the court did not find "any credible evidence" before the court that the tape had been tampered with or modified. Though counsel requested a continuance to present the tape to an expert "so that he could perhaps maybe employ some perhaps maybe expert who would perhaps examine it and perhaps have evidence of tampering," the court found "too many ifs and too many perhaps to satisfy" the court. (S.C.R., vol. 4, 264-65). Lastly, counsel had been supplied the tape promptly after July 22 and the motion for continuance was filed the Friday before trial was to begin. (*Id.* at 264). Considering that the trial had been continued twice on defense motion and once by joint motion, and that the defense would not be prejudiced by the denial, the court found Dahl's second motion untimely and without merit. As the denial was based on ample evidence and sound reasoning, this Court finds that the state court did not abuse its discretion in rejection Dahl's second motion for continuance.

The third request for continuance is based upon the disclosure by the prosecution of Dahl's statements to Hogancamp in the fall of 2004 in an Issaquena County jail. The prosecution provided notice to Dahl's counsel the Friday before trial that Hogancamp would testify at trial that Dahl made incriminating statements to him at the jail. Dahl's counsel argued that this was a discovery violation and he should be allowed time to interview Hogancamp and other prisoners present for the statement. The trial court treated the disclosure according to the *Box* procedure for discovery violations regardless of counsel's ability to interview Hogancamp at any time before the trial, his knowing Hogancamp would testify at trial since his guilty plea on January 14, 2005 at which he was present and having ample opportunity to interview Dahl about his time in Issaquena County. (S.C.R., vol. 4, 266); *See Scott v. State*, 831 So. 2d 576, 577 (Miss. Ct. App.

38

2002)(holding that when one party's attempt to enter new discoverable evidence at trial constitutes a discovery violation the Court must follow the *Box* guidelines as codified in rule 9.04(I) of the Uniform Rules of Circuit and County Court).

When faced with a *Box* objection, a Mississippi court must:

> 10. Grant the defense a reasonable opportunity to interview the newly discovered witness, to examine the newly produced documents, photographs or other evidence; and

> 11. If, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court shall, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the nondisclosed evidence or grant a mistrial.

> 12. The court shall not be required to grant either a continuance or mistrial for such a discovery violation if the prosecution withdraws its efforts to introduce such evidence.

UNIF. R. OF CIR. AND CTY. CT. 9.04(I) (2011).  Accordingly, the trial court judge granted Dahl's counsel a continuance until noon the next day to find whether there were any witnesses to the conversation in which Dahl made the incriminating statement. (S.C.R., vol. 4, 272). The Mississippi Supreme Court has stated that in some situations "postponement of a day or two, or in some cases even an hour or two, will suffice." *Foster v. State*, 484 So. 2d 1009, 1011 (Miss. 1986).

The next day, Tuesday, August 23, 2005, Dahl's counsel re-urged his motion for continuance. Counsel noted that he went to the Jackson County Adult Detention Center ("ADC"), where the men were housed before being transported to Issaquena County in anticipation of hurricane Ivan, and learned that Dahl and Hogancamp were housed in the same zone in Issaquena County. (S.C.R., vol. 4, 275). Counsel interviewed Hogancamp who verified that the men were housed in the same zone and gave counsel names of two men who were

housed in the same zone and shared bunks with those men during that time. (*Id.*) Counsel was unable to locate one of the men, he had been released and could not be found, but was able to interview the other who informed counsel he was the last prisoner left at the ADC who had been transported to Issaquena County with Dahl and Hogancamp. (*Id.* at 276). Though the prisoner stated that he could hear the men talking at times, "basically he didn't know anything." (*Id.*) Counsel argued that there were about sixty potential witnesses, that he had limited resources to finds them and would have to search them out himself, and that given the prisoner he found testified the men did talk, one of these sixty might have some knowledge of the conversation.(*Id.*)

The court again took notice that counsel was informed Hogancamp would testify at his guilty plea in January of 2005 and had all video, audio and transcripts of his statements to law enforcement and his allocution at this plea. (Id. at 279) Counsel had access to Hogancamp at any time for an interview had one been requested. (Id. at 280)  In addition, the prosecution first learned of the statement at the interview on Friday, August 19, and immediately advised defense counsel of the Hogancamp's statement. (Id. at 280)  Under such circumstances, the trial court did not find the disclosure to be a discovery violation. (Id. at 280)  And with the information gathered by counsel, the court found "prospects of obtaining any further information dim . . . even if a continuance was granted."  According to these findings, the court offered to issue a subpoena for the prisoner-witness and denied the continuance.

This Court finds that the trial court's denial of Dahl's third motion for continuance does not rise to an abuse of discretion. The court followed the appropriate *Box* procedure and found no discovery violation, unfair surprise, or prejudice. The state court's denial of this claim was not

contrary to or an unreasonable application of clearly established federal law. As a result, Ground Three does not warrant habeas relief.

## D.

In Ground Four, Dahl argues that state prosecutors concealed, misused and did not disclose evidence favorable to his defense denying him of a fair trial and effective assistance of counsel. Specifically, he claims that the prosecution hid evidence of an alleged deal made with Hogancamp for his testimony at trial in contravention of *Brady v. Maryland* and *Giglio v. United States* and also knowingly presented false testimony at trial that a deal was not made. (Pet'n. [2-1] 28.) In Ground Five, Dahl argues that prosecution knowingly used the false testimony of Hogancamp that he made no deal with the prosecution. To round out both claims, Dahl argues that counsel's failure to "reveal this deal along with perjured testimony" constitutes ineffective assistance of counsel.

To establish a federal habeas claim based upon *Brady v. Maryland*, a prisoner must show that prosecution withheld evidence favorable to his defense and that such evidence was material to either guilt or punishment. *Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011). A successful *Brady* claim must meet three requirements: "(1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the State suppressed the evidence, either willfully or inadvertently; (3) and prejudice . . . ensued." *Id.* (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). For the violation to be material there must be a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone v. Bell*, 129 S. Ct. 1769, 1783 (2009).

A conviction secured through the knowing use of perjured testimony violates the due process rights of a defendant. To establish a due process claim based upon a prosecution's

41

knowing use of perjured testimony, a petitioner must show: (1) the evidence or testimony was false, (2) the evidence or testimony was material, and (3) the prosecution knew the evidence or testimony was false. *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001)(citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). Under *Giglio*, perjured evidence is material if "in any reasonable likelihood [it could] have affected the judgment of the jury," a lower threshold than in a *Brady* analysis. *Giglio*, 405 U.S. at 766; *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993)("[I]f the prosecutor has knowingly used perjured testimony or false evidence, the standard is considerably less onerous . . . ").

Dahl points to Hogancamp's plea hearing as the only evidence in the state record that a deal was made. At the hearing, the prosecutor stated: "I have met with the family on two different occasions and they understand the position of the State and why this deal was made, why the charge was reduced." (Pet'n. [2-2], 15.) Despite the prosecutions choice of words at the plea hearing, there is no evidence before this Court that a deal was struck between the prosecution and Mr. Hogancamp compelling any false testimony.

Hogancamp gave a voluntary confession to Moss Point law enforcement on or about June 18, 2003. In his final statement, Hogancamp confessed to both murders and implicated Dahl by alleging he participated in the robbery and murders by hiding in a closet with a baseball bat. (S.C.R., vol. 7, 603). This statement was factually similar to the allocution made at his plea hearing one year and six months later on January 14, 2005. There is no claim nor is there any evidence before this Court either that Dahl was promised anything in return for his confession or that his testimony was altered by the reduction in his charges. Hogancamp's final statement remained consistent from his voluntary confession to the allocution at his plea hearing and to his testimony at trial. In addition, Hogancamp's final statement was the least damaging to Dahl. So

assuming, but not admitting, any influence did occur, it resulted in Hogancamp taking sole responsibility for committing the act of both murders, a break from past statements suggesting Dahl had committed the murder of Sellers himself. (S.C.R., vol. 7, 585).

At his plea hearing, Hogancamp admitted his guilt, testified that no promises were made to procure his plea, and understood that his sentence was to be life in prison. (Pet'n, [2-2], 7.) Prosecution also entered a motion to reduce Hogancamp's charges to deliberate design murder and the court granted that motion. "The exercise of prosecutorial discretion is to be given great deference by the courts." *U.S. v. Hamm*, 659 F.2d 624, 628 n.13 (1981). This is explicitly so in Mississippi, as its highest court has stated:

> [T]he capacity of prosecutorial discretion to provide individualized justice is "firmly entrenched in American law." As we have noted a prosecutor can decline to charge, offer a plea bargain, or decline to seek a death sentence in any particular case. Of course, "the power to be lenient [also] is the power to discriminate," but a capital punishment system that did not allow for discretionary acts of leniency "would be totally alien to our notions of criminal justice.

*Watts v. State,* 717 So. 2d 314, 320 (Miss. 1998)(quoting *Ladner v.* State, 584 So. 2d 743, 751(Miss. 1991)).  The choice to reduce Hogancamp's charges was a discretionary choice made by prosecutors contingent upon the voluntary and truthful confession of guilt given by Hogancamp.[7]  There is no evidence that this reduction was the result of any type of plea agreement or deal that influenced Hogancamp's testimony.

Because there was no deal behind Hogancamp's reduced charges, but rather a discretionary reduction predicated upon a promise to testify truthfully, there can be no violation

---

[7] On cross-examination, Hogancamp testified that, "As far as my understanding, they gave me life with parole for the simple fact that I took responsibility for what I done [sic] and was willing to tell the truth for [sic] what happened." (S.C.R., vol. 6, 605). According to the record of the plea hearing, the prosecution reduced his charge predicated upon Hogancamp's truthful testimony "as to his involvement and anybody else's involvement in that crime." (Pet'n. [2-2] p.6) The state never specifically requested testimony at Dahl's trial as a predicate for the reduction.

43

of *Brady* or knowing presentation of false testimony. Dahl's counsel did enter a motion to reveal agreements that could possibly influence testimony of any prosecution witness yet, as there were no agreements to be revealed, the prosecution produced no evidence of agreements. Regardless, Dahl's counsel, though physically at Hogancamp's plea hearing, was provided a transcript after the hearing with an attached letter notifying counsel that Hogancamp was a potential state witness at Dahl's trial. So though there was no deal to disclose, prosecution shared Hogancamp's testimony with counsel in a timely fashion before trial, allowing the defense to construct an argument for the jury that Dahl's testimony was the fruit of favorable treatment.

Further, defense counsel's representation at trial was not ineffective. Considering defense counsel's motion to reveal agreements, his presence at Hogancamp's plea hearing, and his consistent arguments to the jury that Hogancamp's testimony was biased and influenced by favorable treatment in opening statements, in thorough cross-examination of Hogancamp and in his closing statements, counsel's performance and trial strategy were clearly reasonable. In addition, this Court finds that no *Brady* violation or knowing presentation of false testimony occurred and as a result, we do not find fault in counsel's failure to lodge a frivolous objection. *Turner v. Quarterman*, 481 F.3d 292, 298 (5th Cir. 2007).

Assuming, *arguendo*, representation was deficient, there was no prejudice to Dahl. Counsel argued that a deal was made at trial and the jury was presented with the facts surrounding the reduction of the charges, Hogancamp's understanding of the reduction and the possible effects of such an alleged deal. Dahl presents no facts or evidence that counsel's alleged deficiencies would call into question the fairness and result of the trial.

Dahl also argues that appellate counsel's failure to raise these issues on appeal constituted ineffective assistance of counsel. "When we do not find prejudice from the trial error,

by extension, we cannot find prejudice from an appellate error predicated on the same issue." *Garcia v. Quarterman*, 454 F.3d 441, 450 (5th Cir. 2006)(quoting *Mayabb v. Johnson*, 168 F.3d 863, 869 (5th Cir. 1999)). As there was no *Brady* violation or knowing presentation of false testimony, Dahl's appellate counsel was not deficient for failing to raise the issue. *Rodriguez v. Quarterman*, 204 Fed. Appx. 489, 497-8 (5th Cir. 2006). Accordingly, the state court's denial of Dahl's arguments in Ground Four and Five were not contrary to or unreasonable applications of clearly established federal law under § 2254(d) and the claim is denied.

## E.

In Ground Six, Dahl claims that the prosecution's alleged "improper prejudicial misstatements of material fact" at closing denied him of a fair trial and effective assistance of counsel. Dahl bases this claim on the prosecutions remarks with regard to the force of which the bat swung by Dahl hit Neal in the head. He argues that in light of the prosecutions opening remarks about the force of the hit, Hogancamp's testimony about the blow to Neal's head and the expert witness' testimony about the lack of damage to Neal's skull, the prosecution's remarks that the blow glanced off Neal's head resulting in no skull fracture were misstatements contrary to the evidence.  Dahl further argues that the court's failure to instruct the jury that counsel's statements are not evidence worsened the problem.

It is well established that the prosecution may "recite to the jury those conclusions and inferences he wishes them to draw from the evidence so long as those inferences are grounded upon evidence." *U.S. v. Loney*, 959 F.2d 1332, 1343 (5th Cir. 1992); *U.S. v. Luis*, 177 Fed. Appx. 411, 411 (5th Cir. 2006). For comments to deprive a defendant's due process rights, the argument must have "so infected the trial with unfairness that there is a reasonable probability that the result would have been different is the proceeding had been conducted properly."

45

*Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999)(citing *Darden v. Wainwright*, 477 U.S. 168 (1986)).

Prosecution argued in closing that the expert's statements that no skull fracture was found was consistent with Hogancamp's testimony that Neal was not knocked out cold. (S.C.R., vol. 8, 939). He also noted that a blow resulting in soft tissue injuries to Neal's head could not be proven because, as the expert testified, the bodies were in such a state of decomposition that the tissue in those areas was gone. *Id.* As a result, the prosecution argued, Dahl's claim that there was no strike to his head because of no proof of fracture or bruise was "insulting." *Id.*

Hogancamp testified on cross-examination that the blow Dahl delivered to Neal did not knock him out, "it dazed him there for a second, but he got up and was struggling and fighting with Jimmy." (S.C.R., vol. 6, 538). The prosecution's expert witness, a forensic pathologist, was not asked about fractures on the skull during direct examination but was asked about the bruising:

> Q: If someone received bruising or damage in the skin area and had been in this state of decomposition, would you expect to find and be able to identify that type of injury?
>
> A: It would depend on how deep the injury went. If the injury is a heavy blow to a place where there is bone that can be broken, and even though the soft tissue is eroded away, I would be able to find fracture of the bone, the driven part of the bone. If the soft tissue only is injured and then it dissolves away in the postmortem changes, then I would not be able to see that.
>
> . . .
>
> Q: And in a body in [Neal's] condition . . . would you be able to determine bruising and items of that nature, such as bruising if someone was hit with a bat?
>
> A: Well, the subtle changes of bruising would be obscured by the dark discoloration of the tissue and it would not be possible for me to distinguish a fresh bruise from other discolorations that were in various parts of the body.

46

(S.C.R., vol. 7, 623, 630). On cross-examination the doctor was asked if he found any fractures on Neal's head, and stated that he had not found any fracture or other evidence on the right side of his head. (S.C.R., vol. 7, 638). As opposed to Dahl's assertions in his petition, the doctor never testified that the lack of any detectable injury on Neal's skull supported the conclusion that Dahl did not hit Neal hard enough to daze him. According to the record, the doctor was never asked by prosecution nor defense what type of bodily injuries typically result from blows by a bat that resulted in unconsciousness or simply disorientation. It is clear, based on a thorough review of the record, that the prosecution's argument before the jury was grounded in testimonial evidence before the jury. As such, the argument did not result in a trial that denied Dahl his due process rights. Further, because the comments were proper, defense counsel's failure to object to the statements cannot establish a *Strickland* claim. *Turner*, 481 F.3d at 298.

Dahl's claim that the judge did not instruct the jury that counsels' statements are not evidence is erroneous. In its preliminary statement to the jury, the trial judge warned:

> I'll caution you now, and I'll also give you instruction later, that statements, arguments and remarks of counsel are not evidence. If it were evidence, they would take the witness stand and testify under oath as any other witness. But it is intended to assist you in understanding the evidence as it comes in, outlining the issues that they think will be in issue or in question or in doubt during the course of the trial., and as an aid to your understanding the evidence as it is developed during the course of the trial, but it's not evidence. The evidence will come from the witnesses.

(S.C.R., vol. 6, 442). Accordingly, this Court finds Dahl's claims in Ground Six are without merit.

### F.

In Ground Seven, Dahl claims that the prosecution's vouching for the credibility Hogancamp in their closing argument violated his due process rights and that counsel's failure to

47

object or raise the issue on appeal resulted in ineffective assistance of counsel. Specifically, Dahl points to the statement by prosecution that, "But he didn't lie after he told the Moss Point Police Department when they played the tape back and he prayed. He didn't lie after that. And they didn't show that he lied after that." (S.C.R., vol. 9, 908).

It is beyond doubt that an expression of personal opinion by a prosecutor "carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment" rather than its own evaluation of the evidence before it. *United States v. Young*, 470 U.S. 1, 19 (1985). It is "axiomatic" that a prosecutor cannot express a personal opinion about the credibility of a witness to the jury. *United States v. Delgado*, 631 F.3d 685, 700-01 (5th Cir. 2011). A closing argument should be a vehicle to assist the jury in identifying issues and analyzing and applying evidence, not an opportunity for a prosecutor to inject opinions of witnesses' veracity into the trial. *Id.* at 701 (citing *United States v. Anchondo-Sandoval*, 910 F.2d 1234, 1238 (5th Cir. 1990)). However, the prejudicial effect of such comments must be tested by evaluating the remarks in the overall context of the trial and then discerning their intended effect. *United States v. Fields*, 72 F.3d 1200, 1207 (5th Cir. 1996). When bolstering the veracity of a witness is responsive to defense attacks on his credibility, the prosecution is afforded more room to maneuver. *Delgado*, 631 F.3d at 701-03, n.18. When a prosecutor's comments are invited by defense counsel attacks, the remarks by prosecutors are not improper "so long as they are designed merely to 'right the scale.'" *Unites States. v. Ramirez-Velasquez*, 322 F.3d 868, 874 (5th Cir. 2003)(quoting *United States v. Young*, 470 U.S. 1, 12-13 (1985)). In this circumstance, a court must evaluate whether the response "did no more than respond substantially in ordered to 'right the scale'" or if the comments "unfairly prejudice the defendant." *Young*, 470 U.S. at 12-13.

The defense began the trial, "This is case is going to come down to whom you believe. There is no doubt. . . .This is a case, ladies and gentlemen, of: I opened my mouth and something else came out. I could not tell the truth. You are going to hear that those are the words spoken by Mr. Hogancamp." (S.C.R., vol. 6, 449). There is no doubt that, after a review of the record, a central part of defense strategy was to impute the credibility of Hogancamp, a prosecution witness. The question thus comes down to whether  the comments of the prosecution were a substantial response to the attack of Hogancamp's credibility or impermissible comments that unfairly prejudiced Hogancamp.

The prosecutorial comments must be taken in the context of the case, and must be taken in the context of the closing argument. The closing arguments of the prosecution centered on the credibility of Hogancamp and Dahl, detailing the evidence before the jury that proved Hogancamp's testimony was believable and Dahl's a lie.

> But if we know he lied, because he said he did, why did we spend an hour getting cross-examined about he to this person, lied to this person. All of those lies, [Hogancamp] said: I lied. I told you I lied. We don't have to spend an hour to know he lied. He said he did.
> But he didn't lie after he told Moss Point Police Department, when they played the tape back and he prayed. He didn't lie after that. And they didn't show that he lied after that. They couldn't. And that might be the reason why they're talking about Piggly Wiggly and Memorial Day. He didn't lie.
> So, why believe Mr. Hogancamp? Why should you? Some common sense reasons. . .

(S.C.R., vol. 9, 909). Looking at the overall context of the comment, the prosecutor was not expressing a personal belief to the jury that Hogancamp was a credible witness. As the record shows, he was supporting his comment on credibility on the evidence before the jury, urging a "conclusion . . . he wishes them to draw from the evidence." *Loney*, 959 F.2d at 1343; *United*

*States v. Washington*, 44 F.3d 1271, 2178 (5th Cir. 1995) ("A prosecutor is not forbidden to argue that the fair inference from the facts presented is that a witness has no reason to lie.").

Assuming, but not conceding, that these remarks were improper, this Court finds no evidence that such comments unfairly prejudiced the defendant. The prosecutor did not unequivocally state that he personally believed Hogancamp nor did he expressly invoke his position as a prosecutor to support his statements. Additionally, as Hogancamp's testimony was corroborated by other testimonial and physical evidence, there was ample other evidence on which the jury could base its decision. Like Grounds Five and Six, because there was no error at trial, trial counsel was not ineffective for failing to object to the prosecution's statements nor was appellate counsel for failing to bring forth the issue on appeal.

This Court finds that the state court's denial of Ground Seven was not contrary to or an unreasonable application of clearly established federal law as contemplated in a §2254(d) analysis. The statements made by the prosecution were a substantial and appropriate response to defense attacks on Hogancamp's credibility and did not unfairly prejudice Dahl.

## G.

In Ground Eight, Dahl claims he was denied effective assistance of counsel and due process as a result of prosecutor's misstatement of the law during closing remarks. Specifically, Dahl argues that prosecutor's remarks that lie detector results "are not admissible in a single court in this country" "shattered "his defense. (S.C.R., vol. 9, 940); (Pet'n [2-1], p. 42.) For such comments to deprive a defendant's due process rights, the argument must have "so infected the trial with unfairness that there is a reasonable probability that the result would have been different is the proceeding had been conducted properly." *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999)(citing *Darden*, 477 U.S. at 106).

On cross-examination of the officer who took Dahl's statements, defense counsel elicited testimony that Dahl had offered to take a polygraph during that time. (S.C.R., vol. 7, 695-97). The questioning went on for some time before prosecution made an objection that such testimony was inadmissible. The court correctly sustained the objection, as Mississippi does not allow "evidence pertaining to a witness's offer to take a polygraph" to be admitted at trial. *Weatherspoon v. State*, 732 So. 2d 158, 163 (Miss. 1999). Dahl did not have the right under state law for the jury to take into consideration his offer to take a polygraph nor its results; any defense based upon his offer was legally improper. Accordingly, the prosecution's statements about the inadmissibility or reliability of polygraph results could not, and did not, render the trial unfair. Furthermore, as the prosecutor's statements were consistent with state law, and did not undermine the fairness of the trial, any objection by counsel would have been frivolous and appellate counsel was not required to present the issue upon appeal. Ground Eight is denied.

### H.

In Ground Ten, Dahl argues that the Mississippi Court of Appeals, though presented with a *Batson* claim on appeal, failed to address that claim in violation of Dahl's due process and equal protection rights. Federal courts presume that a state court adjudicated a claim on the merits when it has been presented with a federal claim and has denied relief absent an indication of reliance upon state procedural law. *Harrington*, 131 S. Ct. at 784-85. For a federal habeas court to consider the state court adjudicated the claim on the merits, a state court need not give an opinion or statement for the reasons of its denial, and it need not "reveal[] which of the elements in a multi-part claim it found insufficient." *Id.* Given this context, and with no evidence presented to the contrary, this Court presumes that the Mississippi Court of Appeals considered all claims presented on appeal, including Dahl's *Batson* challenges. Ground Ten is denied.

# I.

In Ground Twelve, Dahl argues that the mention of Hogancamp's guilty plea by prosecutors to prove his guilt violated his due process rights and counsels' failure to raise an objection at trial or present the issue on appeal rendered their assistance ineffective. Again, a federal habeas court does not review a trial court's decision based on state evidentiary laws. This Court is limited to reviewing for errors of constitutional magnitude. Accordingly, a federal habeas court will grant relief if the prosecutor's comments "so infected the trial with unfairness that there is a reasonable probability that the result would have been different is the proceeding had been conducted properly." *Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999) (citing *Darden*, 477 U.S. at 168).

In order to determine if the statements made by the prosecution present a violation of constitutional proportions, we turn to the record. Dahl points to two different statements. First, the prosecution made statements regarding Hogancamp's plea during voir dire:

> Q: So, I ask y'all, does that put anybody in just an uncomfortable position? I don't want to be a referee of disputes. I don't want to listen to two sides of a story. Does anybody feel like that? Now is the time to tell us.
>
> . . .
>
> Q: So, everybody can accept that duty the Court is going to give you.
>      I'll give you a better example. There is, or there was a co-defendant in this case. He pled guilty, he got life in jail. He is going -- it is expected that he will testify. Y'all have to listen to his testimony. You're going to have to listen to a statement the defendant may have given to the police. And y'all are going to have to decide what happened on May 25th, 2003.
>
> . . .
>
> Q: I guess the question I was getting at, I told y'all that a twice-convicted murderer may testify, and I want to know if anybody is right there going, I'm not listening to him.

(S.C.R., vol. 5, 334-338). Second, in closing argument, the prosecution stated:

> "Members of the jury . . . I ask you on behalf of the family when you're considering the verdict in this case, don't be misled by the sentences. They both deserve to be in the same place for a life sentence. I ask you, please, it is time, it is time for Jimmy Dahl to answer for the crime that he committed on May 25th, 2003. I ask you, please, on behalf of the families and justice, to find him guilty of capital murder on both counts.

(S.C.R., vol. 9, 945). It is clear, taking the prosecutor's statements in the context of the trial that no effort was made to use Hogancamp's testimony as substantive evidence of Dahl's guilt in a way that rendered the trial unfair. In the first statement, the prosecution invoked his guilty plea to determine if jurors could listen to his testimony without bias. There was no reference to Dahl's guilt or innocence in those remarks. The second was a response to defense argument that, because Hogancamp committed the murders, and received life with a chance of parole, the jury should not convict Dahl of a crime with a weightier sentence. The prosecutor claimed they were both guilty, not that one's guilt should be inferred from the other. In light of the whole record, these statements did not render Dahl's trial wholly unfair or undermine this court's confidence in its results.

Because we find no error in the statements, and counsel is given deference regarding its trial strategies, trial counsel's performance was not deficient. During the first statements made in voire dire, defense counsel made an appropriate objection heading off any attempt by prosecution to discuss any failure of Dahl to testify. Counsel was clearly aware of what the prosecution was doing in voir dire, and made a strategic choice not to make a frivolous objection to prosecution's statements. Appellate counsel was also not deficient, as there was no error at trial and appellate counsel is under no duty to raise all issues before the appellate courts, even those that are meritorious. *Green v.*

53

*Johnson*, 116 F.3d 1125, 1126 (5th Cir. 1997). Dahl's claims in Ground Twelve are denied.

## J.

Lastly, in Ground Thirteen, Dahl claims that the cumulative effect of the errors deprived him of a fair trial. A cumulative error claim warrants habeas relief only when such errors are of a constitutional dimension. *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007). The cumulative error doctrine does provide for the possibility that an aggregate of non-reversible errors can deny a defendant of his constitutional right to a fair trial. *Delgado*, 631 F.3d at 698. In *Delgado*, the court set some factors courts must consider when faced with a cumulative error claim:

> A reviewing tribunal must consider each claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the government's case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*Id.* at 699. Though Dahl claims a host of errors in his petition, this court found all claims to be without merit and most, if not all, of those claims had no basis after review of the complete record and the evidence before this Court. In addition, in this Court's judgment, there is no dispute that Dahl received adequate representation and a fair trial. The trial court made well-reasoned judgments based on ample evidence and valid law in any decision contested by defendant, and provided the jury with the correct warnings, instructions, and guidance to ensure that the trial arrived at a proper outcome. In the end, the jury was presented with ample proper evidence to convict Dahl of the underlying crimes. Therefore, Ground Thirteen is denied.

## <u>CONCLUSION</u>

For the reasons discussed above, this Court recommends that Dahl's Petition [2-1] for Writ of Habeas Corpus be denied.  In accordance with Rules of this Court, any party, within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the District Judge, the U.S. Magistrate Judge, and the opposing party.  The District Judge at that time may accept, reject or modify in whole or in part, the recommendation of the Magistrate Judge, or may receive further evidence or recommit the matter to this Court with instructions.  Failure to timely file written objections to proposed findings, conclusions, and recommendations contained in this report will bar an aggrieved party, except on the grounds of plain error, from attacking on appeal unobjected to proposed factual findings and legal conclusions accepted by the district Court.  *Douglass v. United States Auto. Ass'n*, 79 F.3d 1425 (5th Cir. 1996).[1]

This the ___9th___ day of September, 2011.

_____s/ John M. Roper, Sr._____
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[1]*Douglass* referred to the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.